16 MAG 2428                                 ORIGINAL

Approved: _____
          MATTHEW PODOLSKY/PATRICK EGAN/NICHOLAS LEWIN
          Assistant United States Attorneys

Before:   THE HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

                                                           APR 13 2016
                                                           S.D. OF N.Y.

------------------------------------X
                                    :   COMPLAINT           DOC #_____
UNITED STATES OF AMERICA            :
                                    :   Violations of 18 U.S.C.
     -v.-                           :   § 554; 50 U.S.C. §§ 1702
                                    :   and 1705
FUYI SUN,                           :
     a/k/a "Frank,"                 :   COUNTY OF OFFENSE:
                                    :   NEW YORK
               Defendant.           :
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     KEEN PEI, being duly sworn, deposes and says that he is a Special Agent with Homeland Security Investigations ("HSI") and charges as follows:

COUNT ONE
(International Emergency Economic Powers Act)

     1.   From at least in or about April 2011 through on or about April 13, 2016, in the Southern District of New York and elsewhere, FUYI SUN, a/k/a "Frank," the defendant, and others known and unknown, knowingly and willfully attempted to export and cause to be exported from the United States to China Toray type M60JB-3000-50B carbon fiber, without having first obtained the required licenses from the United States Department of Commerce, in violation of Title 50, United States Code, Sections 1702 and 1705.

     (Title 50, United States Code, Sections 1702 and 1705.)

COUNT TWO
(Conspiracy to Violate the International Emergency Economic Powers Act)

2. From at least in or about April 2011 through on or about April 13, 2016, in the Southern District of New York and elsewhere, FUYI SUN, a/k/a "Frank," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, SUN agreed with others known and unknown to export from the United States to China Toray type M60JB-3000-50B carbon fiber without first having obtained the required licenses from the United States Department of Commerce, in violation of Title 50, United States Code, Sections 1702 and 1705.

3. It was a part and object of the conspiracy that FUYI SUN, a/k/a "Frank," the defendant, and others known and unknown, knowingly and willfully would and did export and cause to be exported from the United States to China Toray type M60JB-3000-50B carbon fiber, without having first obtained the required licenses from the United States Department of Commerce, in violation of Title 50, United States Code, Sections 1702 and 1705.

(Title 50, United States Code, Sections 1702 and 1705.)

COUNT THREE
(Smuggling Goods from the United States)

4. From at least in or about April 2011 through on or about April 13, 2016, FUYI SUN, a/k/a "Frank," the defendant, fraudulently and knowingly did attempt to export and send from the United States, any merchandise, article, and object contrary to any law and regulation of the United States, and did attempt to receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, article and object, prior to exportation, knowing the same to be intended for exportation contrary to any law and regulation of the United States, and aided and abetted the same, to wit, SUN attempted to export from the United States to China Toray type M60JB-3000-50B carbon fiber without first having obtained the

required licenses from the United States Department of Commerce, in violation of Title 50, United States Code, Sections 1702 and 1705.

(Title 18, United States Code, Section 554.)

The bases for my knowledge and for the foregoing charges are as follows:

5. I have been a Special Agent with HSI since December 2007, and I have been assigned to the Counter-Proliferation Investigations group where I investigate, among other things, violations of federal laws involving the export of items from the United States in violation of the export control laws of the United States.

6. I have been personally involved in the investigation of this matter, and I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, my review of documents and records, conversations I have had with other law enforcement officers about this matter, and my training and experience. Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not included the details of every aspect of the investigation. Where actions, conversations, and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

## IEEPA

7. Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 et seq., the President of the United States is granted the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States. Under IEEPA, the President can declare a national emergency through Executive Orders that have the full force and effect of law.

8. The export of so-called "commerce controlled" items is regulated by the Department of Commerce ("DOC") through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774. Under the EAR, DOC imposes license or other requirements before an item subject to the EAR can be lawfully exported from the United States or lawfully re-exported from another country. These items are listed on the commerce control list, or "CCL," published at 15 C.F.R. § 774, Supp. No. 1.

9. On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to United States goods and technologies. This national emergency has been extended by successive Presidential Notices, the most recent being that of August 7, 2015, 80 Fed. Reg. 48,233 (Aug. 11, 2015), continuing the EAR in effect under IEEPA.

10. Pursuant to its authority derived from IEEPA, DOC reviews and controls the export of certain goods and technology from the United States to foreign countries.

   a. In particular, DOC has placed restrictions on the export of goods and technology that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.

   b. Under IEEPA and the EAR, it is a crime to, among other things, willfully export, conspire to export, or attempt to export from the United States or, aid and abet the export from the United States, of any item subject to the EAR for which a license is required without first obtaining the license from DOC. 50 U.S.C. §§ 1705(a), 1705(c); 15 C.F.R. § 764.2.

<u>Carbon Fiber</u>

11. Based on my training and experience and my review of documents and records, I know that certain types of carbon fiber are commodities that have both military and non-military uses and are subject to DOC license regulations. Carbon fiber composites are ideally suited to applications where strength, stiffness, lower weight, and outstanding fatigue characteristics are critical requirements. These composites also can be used in applications where high temperature, chemical inertness and high damping are important.

12. Based on my training and experience and my review of documents and records, I know that the two main applications of carbon fiber are in specialized technology, which includes aerospace and nuclear engineering, and in general engineering and transportation, which includes engineering components such as bearings, gears, cams, fan blades and automobile bodies. In addition, certain carbon fiber based composites are used in military aircraft. In particular, with respect to a specific type of carbon fiber - Toray type M60JB-3000-50B carbon fiber

("M60 Carbon Fiber") – I have learned the following, among other things:

      a.   M60 Carbon Fiber is an extremely high-grade carbon fiber, and is used primarily in aerospace and military applications.

      b.   More specifically, representatives of the manufacturer of M60 Carbon Fiber have stated to law enforcement that M60 Carbon Fiber has applications in aerospace, unmanned aerial vehicles (commonly known as "drones") and other government defense applications.

    13.   Based on my conversations with a DOC official, I have learned the following, among other things:

      a.   On or about November 5, 2015, DOC determined that the M60 Carbon Fiber requested by FUYI SUN, a/k/a "Frank," the defendant, as set forth below, is under the licensing jurisdiction of DOC and would require a license for export to China pursuant to IEEPA and the EAR.

      b.   DOC has not issued a license to SUN or to any individual or entity involved in the proposed transaction set forth below.

      c.   DOC has further determined that M60 Carbon Fiber is classified under Export Control Classification Number 1C210.A, and controlled for nuclear non-proliferation and anti-terrorism reasons.

<u>SUN's Efforts to Acquire Carbon Fiber in 2011 and 2013</u>

    14.   HSI has established an undercover website that purports to be for a United States-based company (the "UC Company") that deals in high-technology commodities, including commodities with aerospace and military applications, such as carbon fiber. The UC Company maintains an on-line "showroom," which depicts various products for sale, including export-controlled items such as certain types of carbon fiber, and provides contact information for a purported representative of the UC Company. HSI undercover special agents ("UC-1" and "UC-2," collectively, the "UCs") maintain the UC Company website and respond to inquiries that are directed to the UC Company.

15. From speaking with the UCs and reading transcripts of recorded conversations with the UCs and emails to and from the UCs, I have learned, in substance and in part, the following:[1]

    a. On or about April 7, 2011, the UC Company received a request via email from an individual ("CC-1") for a price quote to purchase carbon fiber. CC-1 subsequently indicated to the UCs that CC-1 worked for a Chinese company and that the carbon fiber CC-1 sought to acquire from the UC Company would be exported to China.

    b. On or about April 25, 2011, during a recorded Skype videoconference with the UCs, CC-1 asked the UCs, among other things, if the carbon fiber, "can't be exported directly [to China], can, can you transfer it to another place first or something?" CC-1 continued: "And I can provide the other countries . . . and I'll, I'll, I'll, I'll set, I'll set up an offshore account, so we can operate it from another [place]." When asked by UC-1 in a subsequent email whether he (CC-1) wanted UC-1 to apply for an export license or preferred to purchase without a license, CC-1 responded by email on or about May 13, 2011, "I want you to apply for an export license all the time."

    c. From in or about May 2011 up to and through in or about December 2011, CC-1 and FUYI SUN, a/k/a "Frank," the defendant, to whom CC-1 referred the UCs for further negotiations, among others, continued to negotiate the purchase of carbon fiber from the UCs. During these negotiations, on or about September 23, 2011, UC-1 informed CC-1 and SUN that DOC had rejected the UC Company's request for an export license.

    d. Approximately a year and a half later, on or about May 6, 2013, CC-1 renewed contact with the UCs, sending an email to the UC Company's email address in which CC-1 requested that the UC Company apply for an export license for carbon fiber.

    e. On or about May 21, 2013, during a recorded Skype video conference with the UCs, SUN stated, among other things, "TORAY M55JB-6K [carbon fiber that SUN wanted to purchase] is

---

[1] Many, but not all, of the communications between FUYI SUN, a/k/a "Frank," the defendant, and CC-1 and the UCs, were in Mandarin, and have been translated into English. The excerpts and quotations set forth herein, are based on draft translations of those communications.

6

closely associated with the military, we can't apply for export license for TORAY M55JB-6K, I have a friend in the United States, he might buy TORAY M55JB-6K, We are discussing."

        f.    The following day, on or about May 22, 2013, the UC Company received multiple emails from SUN, stating, in substance and in part, the following:

            i.    SUN would travel to the United States on a tourist visa to purchase 100 kilograms of carbon fiber from the UC Company and would bring the carbon fiber back to China with him in his luggage.

            ii.    SUN explained that "fiber is not dangerous goods in aviation," so it would be feasible to transport the carbon fiber on his return flight to China. SUN further assured the UC Company that "[w]e have consigned fiber many times in foreign countries."

            iii.    SUN also expressed concern that "[t]he [email] network is not safe."

            iv.    Accordingly, SUN directed the UC Company to use coded language in future communications. Specifically, SUN instructed: "It [the carbon fiber] is called the banana in the future."

        g.    Just over one week later, on or about May 31, 2013, SUN and UC-1 exchanged multiple emails. In those emails — which principally concerned logistical details for the planned sale of the carbon fiber, such as price and transportation — SUN used the prearranged code, substituting the term "banana" for carbon fiber. During those emails on or about May 31, 2013, SUN and UC-1 discussed the following, in substance and in part:

            i.    SUN complimented the UC-1's "courage" in agreeing to sell carbon fiber without a license. He wrote: "I understand your profit is scanty this time. If we get a license in the future, I will let you get rich profit in the T800 [a specific type of carbon fiber]. . . . Your courage is remarkable."

            ii.    SUN explained that because SUN was planning to transport the carbon fiber he intended to purchase from the UCs to China in small batches, the "transportation cost is huge." He assured UC-1, however, that "we carry a small amount of banana every time, this way is safe."

7

    iii. SUN then described how he intended to package the carbon fiber. He proceeded to assess how much carbon fiber could fit in certain-sized boxes, by assuming: "banana is 12 inches tall x 6 inches."

    iv. SUN explained that, although "[t]he number of bananas is very small," and therefore the UC Company would not be making a profit, "it is important that trade is successful this time" because a successful trade would "open[] a new era" between SUN and the UC Company.

    v. SUN also described the pricing of the carbon fiber. Among other things, under a portion of his email called, "Seller supply of banana," SUN described the quantity of "banana" as "150 kg."; the price of the "banana" as "$450/kg"; and therefore, the total cost, after subtracting a $500 deposit, as "$62,500."

   h. After additional negotiations, approximately two weeks later, on or about June 4, 2013, the UC Company received an email from SUN stating, in substance and in part, the following:

    i. SUN's colleague, CC-1, suspected that one of the UCs was, in fact, an undercover United States law enforcement agent. Therefore, SUN and CC-1 had decided not to purchase carbon fiber from the UC Company.

    ii. SUN included in the text of his email what appeared to be a news article. The article forwarded by SUN began, "In the last two months the U.S. FBI (Federal Bureau of Investigation) arrested three men (an American and two Iranians) and charged them with illegally exporting carbon fiber to Iran, where it can be used in weapons development, including nuclear weapons." The forwarded article continued, "The recent arrests came right after the FBI had defeated a Chinese attempt to illegally obtain carbon fiber for their new fighter jets." The forwarded article further specified that the specific type of carbon fiber involved in that case was M60 Carbon Fiber which, the article stated, "is an essential component of China's stealth fighters."

    iii. SUN concluded by telling the UCs that, because CC-1 was suspicious that UC-1 was actually a United States federal agent, SUN and CC-1 would not purchase carbon fiber from the UC Company at that time, but SUN hoped to contact the UC Company again in the future.

### SUN's Efforts to Purchase and Export Carbon Fiber in 2015 and 2016

16.  From speaking with the UCs and reading draft English-language transcripts of recorded conversations between FUYI SUN, a/k/a "Frank," the defendant, and the UCs and emails to and from the UCs and SUN, I have learned, among other things, that, beginning in or about 2015, SUN re-commenced negotiations that — as set forth in more detail below — ultimately resulted in SUN traveling to New York, New York on or about April 11, 2016, in an attempt to purchase M60 Carbon Fiber from the UC Company.

   a.  On or about August 5, 2015, SUN and the UCs participated in a recorded Skype videoconference. In addition to the UCs and SUN, another co-conspirator of SUN's ("CC-2"), who claimed to be a senior employee of a global company in China, was also on the Skype videoconference. During this videoconference, the following occurred, in substance and in part:

      i.  SUN told the UCs that he wanted to buy M60 Carbon Fiber and that his plan was "to order a smaller quantity" of the "merchandise" first, so that he could show his clients that he can obtain "the high quality one, that we do have a channel to get the high quality one."

      ii.  UC-1 explained to SUN and CC-2 that UC-1 wanted to know more about SUN's own customers. UC-1 explained: "[t]here is that risk that . . . this is essentially against the law, and there are risks with that such as the fine . . . having good seized or, or going to jail." UC-1 further stated that UC-1 typically sold M60 Carbon Fiber to other long-term customers with an export license, which SUN did not have. Accordingly, before going forward with a sale of M60 Carbon Fiber to SUN, UC-1 wanted to know a bit more about SUN's customers.

      iii.  In response to UC-1's inquiry, SUN first claimed that the carbon fiber was for a university lab in China. When the UCs responded that no lab needed any amount near the quantity of carbon fiber that SUN was seeking to purchase from the UC Company, SUN backtracked, stating, "What [UC-1] said is completely correct." SUN continued: "But let me tell you this. We have many agencies, not just one agency. I've told you about one agency only. It's not possible for me to tell you about all the other agencies."

      iv.  SUN then questioned why UC-1 needed to know the identity of SUN's customer for the carbon fiber. Referring

to the risk of exporting carbon fiber without a license, UC-1 responded to SUN: "I'd like to know who the other end users are, to know what my risk is. For instance, over here in the United States, many of my biggest customers for this [M60 Carbon Fiber] are defense related customers. I suspect the same for you, but I'd like you to be honest with me."

    v.  SUN responded to UC-1: "You don't need to worry. This won't be used for the usual, usual defense purpose. It's for testing only." SUN continued: "If we successfully conduct this transaction, the next order is not just going to be one or two containers of the goods. It's going to be much more." Speaking to UC-2 (a Mandarin speaker), SUN said, in Mandarin: "Tell [UC-1] not to take me as just another ordinary client." SUN continued, in Mandarin: "I am . . . I am of the market in China."

    vi.  Following that exchange, CC-2 stated, among other things, that she had professional relationships with organizations "from the China, uh, research institutions" which CC-2 suggested are "owned by [the Chinese] government."

    vii.  CC-2 continued by explaining, "[R]esearch institutions are all, al- always works [sic] on the high, high, high, high quality, high, high, high technology products research department for China country." CC-2 further clarified that Chinese research institutions use a "middle company" because the research institutions "make some, you know [laughs] uh, uh, very restricted products."

    viii.  The UCs then asked CC-2 to give the UCs the name of her company, which she claimed has "common channels" with SUN's company. CC-2 refused. Among other things, CC-2 responded that "there's some . . . political, uh, company, company complex issues because we are, yeah, I'm acting as global staff [UI] also, uh a lot of things. I have to step out. Uh, uh, uh." CC-2 then told the UCs that, before she told the UCs the name of her company, she wanted to consult others inside her company. The UCs challenged CC-2: "I don't think you're really gonna go ask your company, 'Can I tell, dear global company, I'm doing something, uh, illegal with [SUN]. Do you mind if I do some more illegal stuff with [SUN]?' That doesn't make any sense, so why don't you just tell me the truth now." CC-2 again refused.

    b.  Approximately two weeks later, on or about August 18, 2015, SUN and the UCs conducted another recorded Skype

10

videoconference. During this videoconference, the following occurred, in substance and in part:

        i. The UCs and SUN discussed certain security measures that needed to be in place in order to execute the illicit carbon fiber sale. For example, the UCs expressed to SUN their concern that the carbon fiber the UC Company was going to sell to SUN could be traced back to the UCs. SUN responded: "Our safety measure is, this is, this is, uh, because we have been doing, we have been doing it for many years. As far as the safety measure is concerned, I told you [UC-1] very clearly about it last time that we will destroy all the barcodes."[2]

        ii. After UC-2 asked SUN to clarify what he meant by his reference to destroying the barcodes, SUN responded: "We will destroy the barcodes, barcodes on every bundle . . . the barcodes on every bundle of carbon fiber, the barcodes on every bundle of carbon fiber." SUN continued: "That . . . basically they won't be able to trace where the merchandise . . . is really coming from."

    c. On or about October 8, 2015, during a recorded Skype videoconference, SUN agreed to meet the UCs in Belgium to purchase the M60 Carbon Fiber from the UCs.

    d. On or about December 18, 2015, SUN wired $500 from a bank account in China to the UC Company's purported bank account held at JPMorgan Chase Bank in New York, New York, as a down payment for SUN's intended purchase of the M60 Carbon Fiber. SUN and the UCs agreed, among other things, that the $500 would be applied to SUN's purchase of approximately 10-15 kilograms of M60 Carbon Fiber, for approximately $18,000 to $21,000, with the final quantity and price to be determined in person.

    e. On or about February 10, 2016, SUN contacted UC-1 by email, and proposed, in substance and in part, that rather than travel to Belgium for the purchase of carbon fiber, SUN would apply for a visa to travel to New York, New York, where the UC Company was purportedly headquartered.

---

[2] Based on my training and experience and participation in this investigation, I have learned that spools of high-grade carbon fiber such as M60 Carbon Fiber are marked with barcodes to identify the manufacturer, type of the carbon fiber, date of production, and lot number.

11

    f. On or about February 21, 2016, SUN contacted UC-1 by email, and stated, in substance and in part, "[t]his time I'm buying 15-18k [M60 Carbon Fiber] . . . . I will pay for it by cash directly."

    g. On or about February 21, 2016, in connection with obtaining a visa for SUN to travel to New York to purchase the M60 Carbon Fiber, SUN emailed UC-1 an image of the inside of a passport issued by the People's Republic of China to "Fuyi Sun." I have compared the photograph contained in the passport image sent to UC-1 with images of SUN from recorded videoconferences with UC-1 and believe the images to depict the same individual. Additionally, based on my in-person observations of SUN described below, I believe SUN to be the same individual depicted in the passport image sent to UC-1 and in the images recorded from videoconferences with UC-1.

    h. On or about March 7, 2016, SUN contacted UC-1 by email, and stated, in substance and in part, that each passenger on SUN's intended flights to/from China and New York is permitted to carry two pieces of luggage, up to 23 kilograms. SUN further "suggest[ed]" that the M60 Carbon Fiber be "repacked with [an] ordinary packing box."

  17. On or about April 1, 2016, UC-1 and FUYI SUN, a/k/a "Frank," the defendant, exchanged multiple emails. In these email exchanges, the following was discussed, in substance and in part:

    a. UC-1 explained to SUN that M60 Carbon Fiber would cost $1,000 per pound.

    b. In response, SUN wrote to UC that he planned to "buy 15 to 21 kg of [M60 Carbon Fiber] this time" (which translates to between approximately 33 and 46 pounds). He explained that this "small amount" will allow him to "test the channels."

SUN's April 2016 Travel to New York to Purchase M60 Carbon Fiber

  18. On or about April 11, 2016, in order to finalize his purchase of M60 Carbon Fiber, FUYI SUN, a/k/a "Frank," the defendant, traveled from China to the United States to meet with the UCs. Almost immediately upon SUN's arrival, SUN and the UCs met at a restaurant, where SUN discussed his business and plans to export the M60 Carbon Fiber from the United States to China. That meeting was recorded and I monitored the meeting in real-time. Based on my monitoring of the meeting, and subsequent

discussions with the UCs, I have learned that the following occurred, in substance and in part:[3]

      a.    SUN stated that he was "excited" about the business opportunities with the UCs. He said that he "[d]oesn't care about price or profit at this point [but only] about opening up the channel. Once the channel is open, everything else works."

      b.    SUN explained to the UCs that his business does not "just deal with one or two clients" but with "the entire market." SUN elaborated that, after he obtains carbon fiber from the UCs, he would be selling them not just to one or two customers but to "the entire market."

      c.    Over less than thirty minutes, SUN gave the UCs a wide variety of different descriptions of the particular end-users to whom he (SUN) would be selling the carbon fiber.

          i.    Initially, SUN explained that such carbon fiber was to be used for civilian uses, like "golf balls" and "roller blad[es]." Then, minutes later, SUN suggested that, in fact, he may be selling the M60 Carbon Fiber to a Chinese military research laboratory. UC-1 and SUN then agreed to continue this discussion in private the next day, rather than at the restaurant.

          ii.    SUN tried to assure UC-1, that the "civilian market" was all UC-1 should be concerned with. SUN continued: "You don't have to deal with the [Chinese] military, and [I'm] aware of the U.S. intelligence so [I don't] want to get you into trouble and [I don't] want trouble." SUN reiterated to UC-1 that he should "[j]ust focus on the [Chinese] civilian market — it's good enough."

    19.    The following day, April 12, 2016, FUYI SUN, a/k/a "Frank," the defendant, met with the UCs at the purported offices of the UC Company, located in the Southern District of New York. This meeting was recorded and I monitored the meeting

---

[3] During the meetings between FUYI SUN, a/k/a "Frank," the defendant, and the UCs on April 11 and 12, 2016, see infra ¶¶ 19, 20, UC-2, who is a Chinese Mandarin speaker, translated between SUN and UC-1, who does not speak Chinese Mandarin. Accordingly, any quoted language from the April 11th and 12th meetings are preliminary recitations of real-time translations done by UC-2 during the meetings.

in real-time. Based on my monitoring of the meeting, and subsequent discussions with the UCs, I have learned that the following occurred, in substance and in part:

  a. Initially, SUN explained that he intended to transship the M60 Carbon Fiber from the UC Company to an associate in Australia, who would then ship it to SUN in China.

    i. SUN indicated that he believed that it would be easier to escape detection by governmental authorities by transshipping through Australia, rather than shipping directly to China.

    ii. When asked by UC-1 about whether SUN's associate in Australia was trustworthy, SUN assured that his Australian associate was "[a]bsolutely, uh, absolutely reliable."

  b. SUN then described to the UCs a prior transaction in which he had acquired carbon fiber from a Korean supplier. SUN explained that, in order to defeat Korean export controls, SUN and the Korean company had arranged to intentionally mislabel the carbon fiber as "acrylic fiber" which, according to SUN, is difficult to visually distinguish from carbon fiber and is not subject to export restrictions. SUN proposed doing the same with the M60 Carbon Fiber he was going to buy from the UC Company.

  c. SUN further explained to the UCs that he had researched "customs security" and how to package carbon fiber in a manner to avoid detection.

  d. In response to a question from UC-1 regarding the volume of carbon fiber SUN anticipated ordering from the UC Company, SUN stated: "honestly, we have a great understanding, relations, with the [Chinese] military units." SUN continued, "I know exactly the needs of the military units there [in China]. I want to start with smaller amounts [of carbon fiber] because . . . in the beginning if you start doing a huge quantity of fibers then the U.S. intelligence or — you know, you probably know better than me — probably becomes suspicious, like why the heck this larger amount of fiber is going out of the U.S." SUN then assured the UCs: "In the beginning we will just say, you know, that we're going to use the fiber for civil use only. Therefore you have nothing to worry about. And, plus, all the labels on the fiber, we'll make sure we remove it, get rid of it, so nobody can tell what the fiber is for."

e. When asked by the UC why the military would purchase carbon fiber from SUN, rather than from others, SUN answered: "Because they can't get it from anyone else."

f. After SUN later claimed that the M60 Carbon Fiber would be used for commercial purposes, and UC-1 noted that M60 Carbon Fiber is too advanced and expensive for such commercial uses, SUN responded that, in the past, he has noticed that his carbon-fiber suppliers had "a lot of concern if it involves the military, so in order for them to be worry-free we are just going to tell them that it's only for civil use."

g. SUN also discussed with the UCs the companies with which he is currently affiliated. Among other things, SUN said that he remains in business with CC-1. SUN also stated that he is affiliated with another company that had previously been involved in the production of components for missiles but explained that, because there was "no war, we [presumably, that company] eventually stopped that." SUN additionally claimed to have been previously employed by the China National Space Administration in Shanghai.

h. After UC-1 advised SUN that he had removed labels from the M60 Carbon Fiber, SUN expressed his agreement with removing the identifying labels from the carbon fiber and noted that doing so was "a good idea."

i. When discussing and confirming the price of the M60 Carbon Fiber, UC-1 noted that there would be an additional charge of $2,000 to cover removing the identifying labels and to account for the risks involved. SUN agreed to this additional charge.

j. SUN removed $30,000 U.S. dollars in cash from his jacket pocket, and gave $25,000 to the UCs.

k. At the end of this meeting, SUN and the UCs inspected the boxes of what SUN was told contained the M60 Carbon Fiber that he was purchasing. During that final inspection, SUN directed the UCs that, prior to shipping, the UCs must remove the carbon fiber from its box - which bore the name "Toray," the manufacturer of the M60 Carbon Fiber - and ship the carbon fiber instead in a blank box.

20. Later in the day on April 12, 2016, after the aforementioned meeting in the purported offices of the UC Company, FUYI SUN, a/k/a "Frank," the defendant, and the UCs met again. This meeting was recorded. Based on my discussions with

15

the UCs, I have learned that the following occurred, in substance and in part:

      a.   SUN told the UCs that, rather than use his Australian friend to transship the M60 Carbon Fiber, SUN preferred that the UCs ship it directly to SUN in China.

      b.   The UCs agreed and SUN wrote instructions for the UCs for how to fill out the shipping information, which included an address in Shanghai and the label "acrylic fiber" (which, as described above, see supra ¶ 19(b), was their agreed-upon description for the carbon fiber).

      c.   SUN subsequently gave the UCs an additional $500 in cash to pay for the UCs to ship the M60 Carbon Fiber directly to Shanghai, China.

21. In the morning of April 13, 2016, law enforcement officers placed FUYI SUN, a/k/a "Frank," the defendant, under arrest.

WHEREFORE, the deponent respectfully requests that FUYI SUN, a/k/a "Frank," the defendant, be imprisoned or bailed, as the case may be.

_____
KEEN PEI
Special Agent
Homeland Security Investigations

Sworn to before me this
13th day of April, 2016

_____
THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York